UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

CRYSTALLEX INTERNATIONAL
CORPORATION,

                    Plaintiff,

     v.

BOLIVARIAN REPUBLIC OF VENEZUELA,

                 Defendant,

and

THE MINISTRY OF DEFENSE OF THE
BOLIVARIAN REPUBLIC OF VENEZUELA

              Proposed Intervenor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

No. 17-mc-00205-VEC

**MEMORANDUM OF LAW IN OPPOSITION TO
THE MINISTRY OF DEFENSE OF THE BOLIVARIAN REPUBLIC OF
VENEZUELA'S MOTION TO INTERVENE AND QUASH WRIT OF EXECUTION**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
(212) 351-4000

*Attorneys for Plaintiff Crystallex
International Corporation*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ........................................................................................ 3

    I.        The Arbitral Award And Judgment ...................................................... 3

    II.      The Republic's Bank Of New York Mellon Account And The Mississippi Litigation ......................................................................................... 5

    III.    The Writ Of Execution, The Turnover Petition, And The Ministry's Motions ............................................................................................ 7

ARGUMENT ............................................................................................................ 9

    I.        The Appropriate Forum For The Ministry's Arguments Is The Turnover Proceeding ...................................................................................... 9

    II.      The Ministry's Challenges To The Writ Are Without Merit ............... 11

          A.      The Funds In The Account Belong To The Republic .............. 11

          B.      The Republic Created, Funded, And Is The Sole Beneficiary Of The Account ...................................................................... 12

          C.      The Existence Of The Account Agreement Makes Plain The Republic's Ownership Interest In The Account Funds ............ 13

          D.      The Ministry And The Republic Are One And The Same ...... 15

          E.      The Preliminary Injunction Issued By The Mississippi Court Has No Bearing On Crystallex's Entitlement To Execute On The Assets In The Account ........................................................... 18

          F.      The Republic Used The Assets In The Account For A Commercial Purpose Within The Meaning Of The FSIA ............................ 21

               1.      The Assets In The Account Are Of A Commercial Nature ......... 21

               2.      The Republic Used The Assets In The Account ........................ 22

CONCLUSION ....................................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

## Cases

*All Am. Trading Corp. v. Cuartel Gen. Fuerza Aerea Guardia Nacional De Nicaragua*,
818 F. Supp. 1552 (S.D. Fla. 1993) ...................................................................21

*Am. Fidelity Fire Ins. Co. v. Paste-Ups Unlimited, Inc.*,
368 F. Supp. 219 (S.D.N.Y. 1973)......................................................................19

*Aurelius Cap. Partners, LP v. Republic of Argentina*,
2009 WL 755231 (S.D.N.Y. Mar. 12, 2009), *rev'd and vacated on other grounds*, 584 F.3d 120 (2d Cir. 2009) .....................................................................20

*Berger v. Raab*,
555 N.Y.S.2d 935 (N.Y. App. Div. 1990) .............................................................20

*Colella v. Republic of Argentina*,
2007 WL 1545204 (N.D. Cal. May 29, 2007) .......................................................21

*Corsair Special Situations Fund, L.P. v. Engineered Framing Sys. Inc.*,
2016 WL 128089 (D. Conn. Jan. 11, 2016)...........................................................18

*De Letelier v. Republic of Chile*,
748 F.2d 790 (2d Cir. 1984)...............................................................................21

*EM Ltd. v. Republic of Argentina*,
2010 WL 2399560 (S.D.N.Y. June 11, 2010) .......................................................23

*Embry v. Palmer*,
107 U.S. 3 (1883)............................................................................................19

*Emp'rs Reins. Corp. v. Mid-Continent Cas. Co.*,
358 F.3d 757 (10th Cir. 2004) ...........................................................................19

*Garb v. Republic of Poland*,
440 F.3d 579 (2d Cir. 2006)...............................................................................15

*Hewlett Park Co. v. 1193-1205 E. Broadway of Hewlett*,
32 Misc. 2d 691 (Sup. Ct. N.Y. Cty. 1961), *aff'd, Hewlett Park Co. v. 1193-1205 E. Broadway of Hewlett*, 17 A.D.2d 736 (1st Dep't 1962).............................................18

*Ladjevardian v. The Republic of Argentina*,
2016 WL 3039189 (S.D.N.Y. May 26, 2016*), aff'd sub nom. Mohammad Ladjevardian, Laina Corp. v. Republic of Argentina*, 663 F. App'x 77 (2d Cir. 2016) ..................................................................................................... *passim*

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*MacArthur v. San Juan Cty.,*
  497 F.3d 1057 (10th Cir. 2007) ............................................... 19

*NML Cap., Ltd. v. Republic of Argentina,*
  680 F.3d 254 (2d Cir. 2012) .................................................... 21

*Republic of Argentina v. Weltover, Inc.,*
  504 U.S. 607 (1992) ................................................................ 21

*Resolution Tr. Corp. v. MacKenzie,*
  60 F.3d 972 (2d Cir. 1995) ...................................................... 14

*S.E.C. v. Wyly,*
  56 F. Supp. 3d 394 (S.D.N.Y. 2014) ....................................... 14

*Stinson v. Hance,*
  2002 WL 31834464 (S.D.N.Y. Dec. 17, 2002) ....................... 19

*Transaero, Inc. v. La Fuerza Aerea Boliviana,*
  30 F.3d 148 (D.C. Cir. 1994) ................................................... 15

*United Euram Corp. v. Union of Soviet Socialist Republics,*
  461 F. Supp. 609 (S.D.N.Y. 1978) .......................................... 21

*United States v. Lin Hu,*
  2011 WL 5884918 (E.D.N.Y. Nov. 23, 2011), *aff'd sub nom. United States v.*
  *Church & Dwight Co.,* 510 F. App'x 55 (2d Cir. 2013) ........... 19

*Wye Oak Tech., Inc. v. Republic of Iraq,*
  72 F. Supp. 3d 356 (D.D.C. 2014) ..................................... 16, 17

**Statutes**

28 U.S.C. § 1603 ......................................................................... 20

28 U.S.C. § 1608 ......................................................................... 15

28 U.S.C. § 1611 ......................................................................... 14

28 U.S.C. § 1738 .................................................................... 18, 19

28 U.S.C. § 1963 ........................................................................... 4

Foreign Sovereign Immunities Act § 1610(c) ..................... *passim*

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Rules**

CPLR 5225..................................................................................................................8

CPLR 5227..................................................................................................................8

CPLR 5230...........................................................................................................11, 14

Federal Rule of Civil Procedure 69 .........................................................................8

Federal Rule of Civil Procedure 5.2 ........................................................................1

## PRELIMINARY STATEMENT

Plaintiff and Judgment Creditor Crystallex International Corporation ("Crystallex") holds a $1.202 billion (plus pre-award interest) judgment against Defendant and Judgment Debtor the Bolivarian Republic of Venezuela (the "Republic").  In an effort to partially satisfy that judgment, in July 2017, after the Republic's motion to stay enforcement had been denied, Crystallex sought and obtained authorization from this Court pursuant to Section 1610(c) of the Foreign Sovereign Immunities Act ("FSIA") for the issuance of a writ of execution directed to commercial assets belonging to the Republic and held in the Republic's Trust Account Number XXXX4314 (the "Account")[1] in New York at The Bank of New York Mellon ("The Bank of New York").  The Account is in the name of the Republic, was funded by the Republic, and is subject to the control of the Republic.  The Republic and The Bank of New York are the only parties to the agreement that governs the Account (the "Account Agreement").  Under that agreement, the Republic is the sole beneficiary of the funds in the Account, and the Account Agreement expressly disclaims the existence of any third-party beneficiaries.  Thus, the Account is clearly property of Crystallex's judgment debtor.  In addition, the Account was created for a commercial purpose, to fund payments to a shipbuilder in Mississippi.  Accordingly, it is subject to execution under the FSIA.

Based on these facts, and others, this Court granted Crystallex's motion for a writ of execution, after which Crystallex delivered the writ to the United States Marshals Service. Under New York law, this created a lien on the Account in Crystallex's favor, and, on August 7, 2017, the Marshals served the writ of execution on The Bank of New York.  After giving The

---

[1]  The full number for the Account has been redacted consistent with the provisions of Rule 5.2 of the Federal Rules of Civil Procedure.  Crystallex can and will provide more detailed account information should it be so directed by the Court.

Bank of New York more than thirty days to turn over the Republic's assets as directed by the writ, Crystallex commenced a turnover proceeding in the Southern District of New York on September 14, 2017 to perfect its lien on the account and obtain a determination that it is entitled to the assets (the "Turnover Proceeding"). That proceeding has been assigned to Judge Vernon S. Broderick.

More than two months after Crystallex's writ was served on The Bank of New York, and nearly a month after Crystallex commenced its Turnover Proceeding, the Ministry of Defense of the Bolivarian Republic of Venezuela (the "Ministry") filed the instant motion to intervene and quash the writ of execution ("Motion"), ECF No. 17, arguing—despite the fact that the Republic is the owner and named beneficiary of the Account, and that the Republic and the Ministry are one and the same—that the Ministry has a superior interest in the Account. On the day after the Ministry filed this motion to quash, the Ministry also filed a motion to dismiss the turnover petition in the separate Turnover Proceeding. The Ministry's two motions—the instant motion pending before this Court and the motion to dismiss pending before Judge Broderick—contain largely identical arguments related to the Ministry's core challenge to Crystallex's execution: the notion that the Republic somehow does not own, or have the ability to use, the assets in The Bank of New York Account.

The pending motions are nothing more than a naked attempt by the Republic, acting through an arm of its executive branch, to delay paying a lawful judgment against it. As discussed in detail below, these motions are without merit. The issuance of the Writ was proper. The only reasonable conclusion that can be drawn from the Account Agreement is that the Account is the Republic's property. Even if the Ministry were properly considered legally separate from the Republic itself (and it is not), the Ministry's claimed interest in the Account

would not cancel out the Republic's interest for purposes of issuing the Writ.  Nor does the existence of a preliminary injunction issued by another court in a different district negate the Republic's interest or somehow divest the Court of its jurisdiction over an asset located in this District.  Crystallex respectfully submits that the Ministry's arguments to the contrary, which are based on inapposite law and fact patterns that are readily distinguishable from those at issue here, should be rejected.

But this Court does not need to decide the merits on this motion.  Because there is no meaningful argument that the Republic does not have an interest in the account, the Ministry's claim that it also has an interest in the Account is more properly viewed as a challenge to Crystallex's turnover petition.  Because the turnover petition is not dependent on the writ of execution, that action will go forward regardless of the outcome of the motion before this Court. A decision in that action, however, could serve effectively to moot the motion before this Court. Accordingly, it would be a waste of judicial resources for this Court to take up the same arguments on this motion.

For these reasons, and those stated in more detail below, Crystallex respectfully requests that this Court deny the Ministry's motion to quash or, in the alternative, hold any decision on the motion in abeyance pending Judge Broderick's decision in the pending Turnover Proceeding.

## STATEMENT OF FACTS

### I.    The Arbitral Award And Judgment

After Crystallex, a Canadian gold producer, spent hundreds of millions of dollars developing Las Cristinas, an extremely valuable gold reserve in Venezuela, the Republic

3

unlawfully expropriated Crystallex's mining rights in 2008.  *See* Ex. 1 ¶¶ 718, 878.[2]  Once the expropriation was complete, Crystallex commenced an arbitration against the Republic in Washington, D.C.  *See id*. ¶¶ 64, 73.  In April 2016, Crystallex obtained a $1.2 billion award—plus pre-award interest of approximately $200 million—against the Republic from the arbitration tribunal.  *See id*. ¶ 961.  Crystallex immediately sought confirmation of that award in the United States District Court for the District of Columbia (the "D.C. Court").  *See* Ex. 2.  The Republic appeared in that action and challenged the award.  *See* Ex. 3.

On March 25, 2017, the D.C. Court issued a decision confirming the arbitral award against the Republic; rejecting the Republic's challenges to the award; and directing entry of judgment in Crystallex's favor in the amount of $1.202 billion, plus pre-award interest (the "Judgment").  *See* Ex. 4.  The Judgment was entered against the Republic on April 7, 2017. Ex. 5.  The Judgment remains unpaid.  Myatt Decl. ¶ 3.

Because the Republic is a foreign sovereign, Crystallex moved the D.C. Court for relief pursuant to FSIA Section 1610(c) and 28 U.S.C. § 1963, asking that court to determine that a reasonable period of time had elapsed since entry of the Judgment, such that Crystallex could seek to attach the Republic's assets in execution of the Judgment, and to permit Crystallex to register the Judgment in other judicial districts of the United States.  *See* Ex. 6.  On June 9, 2017, the D.C. Court granted Crystallex's motion in full.  *See* Ex. 7 at 5.  The Republic failed to post a bond and its subsequent motion to stay execution of the Judgment was denied on August 8, 2017. *See* Ex. 8 at 6.

---

[2]  Unless otherwise stated, all references herein to "Ex. ___" refer to exhibits attached to the Declaration of Jason W. Myatt, dated November 3, 2017 ("Myatt Decl.").

Crystallex registered its Judgment against the Republic in the Southern District of New York on June 15, 2017.  *See* ECF No. 1.

## II.     The Republic's Bank Of New York Mellon Account And The Mississippi Litigation

Through its efforts to identify United States-based assets belonging to the Republic upon which it might seek to execute, Crystallex learned about the Republic's Account at The Bank of New York.  In June 1997, the Republic created the Account pursuant to an agreement with The Bank of New York.  Ministry Ex. B.[3]  The Republic allegedly created the Account in connection with a December 1997 contract between the Republic (executed by the Ministry) and Ingalls Shipbuilding, Inc. (now known as Huntington Ingalls Industries) ("Ingalls"), pursuant to which Ingalls would repair, modernize, and maintain two Venezuelan frigates (the "Contract").  Ex. 9 ¶¶ 9–17; Ex. 10.  The Republic funded the Account using the proceeds of a private placement of bonds issued by the Republic.  Ministry Ex. B at 1;  Ex. 9. ¶ 157; Ex. 11 (indicating that the Republic is the issuer of the bonds).

Pursuant to the Account Agreement—to which the only parties are "The Republic of Venezuela" and "The Bank of New York, as Trustee"—The Bank of New York would "hold all estate, right, title and interest in and to the Trust Funds in trust ***for the use and benefit of the Republic***."  Ministry Ex. B § 2.1.  The Account Agreement is "for the exclusive benefit of the parties hereto [*i.e.* The Republic and The Bank of New York] . . . and shall not be deemed to give, either express or implied, any legal or equitable right, remedy, or claim to any other entity or person whatsoever."  *Id.* § 8.11.  The Account Agreement further provides that The Bank of New York could not make disbursements from the Account, to Ingalls or otherwise, absent

---

[3]  References to "Ministry Ex. __" refer to exhibits attached to the Ministry's Motion, ECF No. 17.

express instructions and approval from the Republic (through its Chief of the Venezuelan

Inspection Committee) and that the Republic may determine in its sole discretion when no

further payments from the Account are due to Ingalls, at which time The Bank of New York

"will promptly remit all remaining Trust Funds to" the Republic via its Ministry of Finance.  *Id.*

§§ 3.1(b), 3.1(e).[4]  In addition, contractual language notwithstanding, the funds in the Account

have been used to fund other obligations of the Republic, including payments to the holders of

the bonds issued to fund the Account in the first place.  *See* Ex. 12 ¶¶ 3–4, 11.

  Crystallex's investigation into the Account revealed that, in 2002, Ingalls had

commenced an action against the Ministry and The Bank of New York in the District Court for

the Southern District of Mississippi (the "Mississippi Court"), the primary purpose of which was

to compel the Ministry to arbitrate the underlying dispute between the parties pursuant to the

Contract (the "Mississippi Litigation").  Ex. 9.  Notwithstanding the Account Agreement's

forum-selection clause, Ingalls's complaint in the Mississippi Litigation includes an ancillary

claim against The Bank of New York, in which Ingalls alleges that The Bank of New York holds

the Account funds for Ingalls's benefit either because Ingalls is an intended beneficiary of the

Account Agreement or because it is the beneficiary of a constructive trust that should be imposed

on the Account.  *Id.* ¶¶ 156–63.  Because the Republic disputed that any money remained owing

to Ingalls and further retained the power to transfer the funds in the Account back to itself or out

---

 [4]  The Account Agreement also contains a forum-selection clause requiring that all litigation
"relating to [the] Agreement . . . shall be brought exclusively in the Supreme Court of the
State of New York, County of New York; in the United States District Court for the Southern
District of New York . . .; or in the courts of Venezuela that sit in Caracas."  *Id.* § 8.1.  And
the Account Agreement mandates that it "be interpreted, construed, enforced and
administered in accordance with the internal substantive laws . . . of the State of New York."
*Id.*

of the United States, on November 8, 2002, shortly after the litigation was commenced, the

Mississippi Court issued an *ex parte* preliminary injunction restraining The Bank of New York

from making payments out of the Account to anyone other than "Ingalls in accordance with the

[Account Agreement], which payments may be made without further order from this Court."[5]

Ministry Ex. A.  After substantial motion practice, the Mississippi Court ordered Ingalls and the

Ministry to arbitrate their claims, and a decision in the arbitration has yet to be issued.  *See* Mot.

at 3.

III.    **The Writ Of Execution, The Turnover Petition, And The Ministry's Motions**

In light of the abundant evidence establishing that the Account was unencumbered

property belonging to the Republic, Crystallex applied *ex parte* to this Court pursuant to FSIA

Section 1610(c) for authorization to proceed by writ of execution against the funds in the

Account (the "Writ").  *See* ECF No. 12-2.  Crystallex's application set forth, in detail, its basis

for pursuing execution against the assets in the Account, and included a description of the

Contract, the Account Agreement, and the Mississippi Litigation, including the preliminary

injunction order.  *See* ECF No. 13 at 6–7, 11–13.  Crystallex specifically addressed the fact that

the assets in the Account belonged to, and were being used for a commercial purpose in the

United States by, the Republic.  *See id.* at 12 (arguing that, "regardless of whether the frigates

themselves were ultimately intended for use for a sovereign purpose, assets intended to be used

to pay for the purchase, maintenance, or repair of those frigates are themselves commercial in

---

[5] Following negotiations between Crystallex and Ingalls, the two creditors of the Republic
claiming an interest in the Account assets, Crystallex understands that Ingalls does not intend
to assert a right to those assets in the Turnover Proceeding.  Crystallex further understands
that Ingalls does not intend to prosecute the claims to the Account that it filed in the
Mississippi Litigation and will seek the vacatur of the Mississippi Court's preliminary
injunction order upon entry of an order from Judge Broderick granting Crystallex's turnover
petition.  Myatt Decl. ¶ 18 n.1.

nature, because private companies could similarly contract for maintenance and repair services"). Further, Crystallex offered compelling arguments in support of its decision to seek authorization for the Writ *ex parte*, noting the Republic's refusal to pay the arbitration award and the history of coordinated efforts between the Republic and its "direct and indirect wholly-owned subsidiaries" to "whisk assets out of the United States before creditors are able to execute on them."  ECF No. 13 at 9 n.6.

This Court considered Crystallex's arguments and, on July 25, 2017, granted Crystallex's *ex parte* application and authorized Crystallex to proceed by the Writ.[6]  ECF No. 12-3.  The Court held, *inter alia*, that "Crystallex seeks execution of judgment against Property that is (a) the property of Venezuela, (b) located in this District, and (c) being used for commercial activity in the United States."  ECF No. 12-4 at 1.  On its face, the Writ attached property of the Republic held at The Bank of New York, including, in particular, the assets in the Account.  ECF No. 11.  The signed Writ was delivered to the United States Marshals Service on July 26, 2017. Myatt Decl. ¶ 5.  On August 7, 2017, the United States Marshals Service effectuated service of the Writ on The Bank of New York.  Myatt Decl. ¶ 5.

On September 14, 2017, after more than thirty days had passed from the date on which The Bank of New York was served with the Writ and because The Bank of New York had not yet turned over the assets in the Account, Crystallex filed a turnover proceeding in this Court pursuant to Federal Rule of Civil Procedure 69, and CPLR 5225(b) and 5227, to perfect the levy on the Account.  *Crystallex Int'l Corp. v. The Bank of New York Mellon*, No. 1:17-cv-07024 (S.D.N.Y.) (the "Turnover Proceeding"), ECF No. 1.  That proceeding was given a new case

---

[6]  Crystallex previously had sought and obtained from the Southern District of New York two other orders under Section 1610(c)—on June 30, 2017 and July 5, 2017—to restrain other assets belonging to the Republic.  Myatt Decl. ¶ 4.

number and was assigned to Judge Vernon S. Broderick.  In its petition, Crystallex requested that

The Bank of New York be directed to turn over the assets held in the Account to Crystallex in

partial satisfaction of its outstanding judgment against the Republic.  Turnover Proceeding ECF

No. 1 at 6.  On September 18, 2017, Crystallex sent notice of its turnover petition to the

Republic.  *See* Myatt Decl. ¶ 7.

Nearly a month after Crystallex filed its turnover petition—and more than two months

after the Writ was served on The Bank of New York—on October 12, 2017, the Ministry filed

the instant motion to intervene in this proceeding and to quash the Writ.  The very next day, the

Ministry brought a "Motion to Intervene and Dismiss the Petition, or Alternatively Transfer

Venue" in the separate Turnover Proceeding.  *See* Turnover Proceeding ECF Nos. 12, 17.  In

support of these two motions, the Ministry raises identical arguments as to why the Account does

not actually belong to the Republic and is not subject to execution.  *Compare* ECF No. 17

(Ministry's Motion to Quash) Sections 1–4 *with* Turnover Proceeding ECF No. 17 (Ministry's

Motion to Dismiss) Sections 1–5.[7]

**ARGUMENT**

**I.    The Appropriate Forum For The Ministry's Arguments Is The Turnover
Proceeding**

The only assets reached by the Writ are the Account assets, which even the Ministry does

not dispute at least nominally belong to Crystallex's judgment debtor, the Republic of

Venezuela.  And the Account assets already are the subject of the Turnover Proceeding.  The

Ministry had more than thirty days between the time that the United States Marshals served the

---

[7]  Contemporaneous with its filing of this opposition, Crystallex is filing an opposition to the
Ministry's motion to dismiss the Turnover Proceeding or, in the alternative, to transfer that
proceeding to the Mississippi Court.  Myatt Decl. ¶ 8.

Writ on The Bank of New York and the time that Crystallex filed its turnover petition to file a motion to quash challenging the legitimacy of the Writ, but it did not do so.  Instead, the Ministry waited until almost thirty days *after* Crystallex commenced the separate Turnover Proceeding to move to quash the Writ in this proceeding.  The primary issue presented on this motion is the same as that at issue in the Turnover Proceeding: whether the Republic's interest in the Account is one upon which Crystallex can execute.  The Ministry already has sought to intervene in the Turnover Proceeding and has moved to dismiss that proceeding based on the same arguments that it presents here.  Turnover Proceeding ECF No. 17.

Put simply, a motion to quash the Writ is no longer the proper way to address the Ministry's purported interest in the Account.  Moreover, because the Turnover Proceeding is not dependent on the issuance (or continued existence) of the Writ, that action will go forward no matter how this Court resolves the instant motion.  This motion, on the other hand, could be rendered effectively moot by a decision by Judge Broderick ordering the Account turned over to Crystallex.  Allowing the Ministry's motion to quash to proceed before Your Honor while the Ministry's nearly identical motion to dismiss the Turnover Petition is pending before Judge Broderick, at best, would be inefficient and, at worst, would risk two Courts issuing irreconcilable determinations concerning the same *res*.[8]

_____

[8]  The Ministry's only argument that is unrelated to the Account, and, therefore, not before Judge Broderick, is its claim that the Writ should be quashed because it includes Ministry property within its scope.  That argument, however, is purely academic.  The only property that the Writ reached—the assets in the Account—is in the Republic's name.  To the extent the language in the Writ is arguably overbroad, in that it references the Ministry, the Writ could be modified *nunc pro tunc*.  But such modification would have no practical impact since, even if the reference to the Ministry was removed, the Writ still would reach the same assets—the Account.

**II.      The Ministry's Challenges To The Writ Are Without Merit**

Even if this Court decides to entertain the Ministry's motion notwithstanding the pending Turnover Proceeding, the Ministry's claims are wholly without merit.  Put simply, the Account belongs to the Republic; the Ministry has no juridical existence separate from the government of which it is part, and thus no separate interest in the Account; and the fact that the property is currently subject to an injunction in Mississippi does not change the ownership of the Account or otherwise alter the fact that the *res* at issue—the Account—is located within this District and thus subject to this Court's jurisdiction.  Indeed, the Republic and The Bank of New York made that point clear when they agreed to having state and federal courts of New York be the exclusive forum for any dispute arising out of the operation of the Account or the Account Agreement.

For all these reasons, and those set forth below, Crystallex respectfully suggests that this Court can deny the motion on the merits.[9]

**A.      The Funds In The Account Belong To The Republic**

The thrust of the Ministry's argument is that the property targeted and attached by the Writ—the funds in the Account at The Bank of New York—does not actually belong to the Republic.  This argument defies logic.  The Republic, not the Ministry, is the entity that created the Account, funded the Account, and for whose benefit The Bank of New York holds legal title to the assets in the Account.  The terms of the Account Agreement make clear that the Republic retains an ownership interest in the assets in the Account within the meaning of CPLR 5230.

---

[9]  Crystallex does not object to the Ministry's intervening in this action for the limited purpose of making this motion to quash.  Crystallex reserves all rights, however, and expressly maintains that the Ministry does not have any legally cognizable independent interest in the Account.

Because the funds in the Account belong to the Republic, the writ of execution directed to those funds was proper.

**B.      The Republic Created, Funded, And Is The Sole Beneficiary Of The Account**

The funds that the Republic deposited in the Account were raised through a debt offering by the Republic.  *See* Ministry Ex. B at 1 ("[T]he Republic has issued $315,000,000 aggregate principal amount of its 9-1/8% Global Notes due 2007 ('the Notes'); Ex. 11 (indicating that the "Republic of Venezuela" will be the issuer of the bonds).  The preamble to the Account Agreement makes clear that the Account was being created because the "***Republic*** wishe[d] to deposit the proceeds of the Notes in a trust with [The Bank of New York] in order to provide for the payment of the ***Republic's*** obligations under ***its*** proposed agreement with [Ingalls] . . . as such payments bec[a]me due."  Ministry Ex. B at 1 (emphasis added).  The Account that was created by the Account Agreement—the Republic of Venezuela Trust Account Number XXXX4314—is in the Republic's name, not the Ministry's name.  *Id.* § 2.2.

Pursuant to the Account Agreement—to which the only parties are "The Republic of Venezuela" and "The Bank of New York, as Trustee"—The Bank of New York would "hold all estate, right, title and interest in and to the Trust Funds in trust ***for the use and benefit of the Republic***."  *Id.* § 2.1 (emphasis added).  And, by its own terms, the Account Agreement is "for the exclusive benefit of the parties hereto [i.e. the Republic and The Bank of New York] . . . and shall not be deemed to give, either express or implied, any legal or equitable right, remedy, or claim to any other entity or person whatsoever."  *Id.* § 8.11.  Thus, even if the Ministry was a separate juridical entity from the Republic—and, as set forth below, it is not—the Account Agreement expressly disclaims the existence of any third-party beneficiaries.

**C.      The Existence Of The Account Agreement Makes Plain The Republic's
         Ownership Interest In The Account Funds**

The terms of the Account Agreement make clear that the Republic not only retains an

ownership interest in the Account assets, but also maintains the ability to direct the use of the

assets in its sole discretion.  The Ministry argues that the existence of the Account Agreement,

which places the Account funds in the hands of The Bank of New York as trustee, precludes the

existence of an attachable ownership interest belonging to the Republic.  But its argument

ignores the actual language of the Account Agreement.

The Republic is the sole beneficiary of the Account Agreement.  Ministry Ex. B § 2.1.

The Republic—through its Chief of the "Venezuelan Inspection Committee," as defined by the

Contract with Ingalls—retained the sole discretion to determine when payments to Ingalls were

due and to instruct The Bank of New York whether and when to make any such payments.  *See

id.* § 3.1(b).  And the Republic—through its Ministry of Finance—retained a reversionary

interest in the Account funds.  *See id.* § 3.1(e) (providing that, upon notice from the Ministry of

Finance that "the Contract has been completed and all payment obligations ***on the part of the

Republic*** have been satisfied, [The Bank of New York] will promptly remit all remaining Trust

Funds to the Ministry of Finance" (emphasis added)).

Relying heavily on *Ladjevardian v. The Republic of Argentina*, 2016 WL 3039189, at *1

(S.D.N.Y. May 26, 2016*), aff'd sub nom. Mohammad Ladjevardian, Laina Corp. v. Republic of

Argentina*, 663 F. App'x 77 (2d Cir. 2016), the Ministry asks this Court to ignore these facts and

find that the existence of a trust agreement strips the Republic of any rights.  But the facts are

dispositive here.  The terms of the agreement at issue in *Ladjevardian* are different from the

terms of the Account Agreement in every material respect.  First, in that case, the sovereign had

"irrevocably assigned" all rights in the funds at issue to the trustee and made clear that "'neither

13

[the sovereign] nor any agency or instrumentality of [the sovereign] shall have any right, title or interest (including, for the avoidance of doubt, proprietary or reversionary interest) of any kind' in the proceeds."  *Ladjevardian*, 2016 WL 3039189, at *3.  Second, unlike the Account funds, the funds at issue in *Ladjevardian* "were held . . . in trust . . . for the benefit of [the] beneficiaries—none of which [was] [the sovereign]."  *Id.* at *3 (internal citations omitted). Third, the trust agreement in *Ladjevardian* did "***not require instruction from the* [*sovereign*]**" but rather required the trustee "to deliver the trust funds to the beneficiaries in accordance with the Agreement's settlement procedures, and provide[d] that ***[the trustee] can take or refuse to take action in its sole discretion***."  *Mohammad Ladjevardian, Laina Corp.*, 663 F. App'x at 79– 80 (emphasis added).  Fourth, while the agreement in *Ladjevardian* provided a reversionary interest to a governmental entity—the Argentinian Central Bank ("BCRA")—this right was "in [BCRA's] capacity as [the sovereign's] creditor."  *Ladjevardian*, 2016 WL 3039189, at *3.  This is different from the reversionary interest to the Ministry of Finance—in its capacity as the Republic's agent—as set forth in the Account Agreement.[10]

Given the fundamental differences between the terms of the Account Agreement and the terms of the *Ladjevardian* agreement, the *Ladjevardian* court's conclusion that the sovereign judgment debtor did not have an executable "interest" within the meaning of CPLR 5230 in the trust funds is inapposite.  In *Ladjevardian*, the "plain terms" of the agreement before the court "show[ed] that the [sovereign] retain[ed] no interest in proceeds paid into the Trust." *Ladjevardian*, 2016 WL 3039189, at *3.  Here, in contrast, the terms of the Account Agreement

---

[10]  The *Ladjevardian* court's holding is consistent with the FSIA's provision that property of a "foreign central bank or monetary authority held for its own account" generally is immune from execution.  28 U.S.C. § 1611(b)(1).  That provision does not apply here.

make clear that the Republic retained an ownership interest in and control over the assets in the Account.[11]  The Republic's existing ownership interest in the Account assets, thus, is subject to execution pursuant to CPLR 5230.

### D.   The Ministry And The Republic Are One And The Same

Notwithstanding that there are no third-party beneficiaries under the Account Agreement, the Ministry maintains that it has some vague interest in the Account because it is obligated to pay Ingalls for the repairs that Ingalls agreed to make on two Venezuelan frigates pursuant to the "secret" Contract between the parties.  *See* Mot. at 2–3.  Putting aside the fact that it offers no argument, much less evidence, that it is entitled to have the Republic pay its bills, the argument is based on a false premise—that the Ministry is separate and apart from the Republic.  It is not. Federal courts have held that armed forces and ministries of defense are political subdivisions of the sovereign and lack separate juridical status because their core functions are governmental. *See, e.g.*, *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994) ("[A]rmed forces are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself, rather than a separate 'agency or instrumentality' of the state.").[12]

---

[11]   The Republic's ongoing ownership of the assets in the Account is further evidenced by the fact that "the parties [to the Account Agreement] intend that this Agreement be construed as a grantor trust."  Ministry Ex. B § 8.12.  *See Resolution Tr. Corp. v. MacKenzie*, 60 F.3d 972, 976 (2d Cir. 1995) (noting that "[a]ssets held in a grantor trust are considered the property of the grantor"); *S.E.C. v. Wyly*, 56 F. Supp. 3d 394, 407–08 (S.D.N.Y. 2014) (finding that a "grantor trust is created when a person contributes cash or property to a trust but retains certain interests such that he is treated as the owner of the trust").

[12]   The same is true of ministries of finance.  *See Garb v. Republic of Poland*, 440 F.3d 579, 595 & n.19 (2d Cir. 2006) (finding that ministry of the treasury was not separate from Republic of Poland and noting that, "apart from the departments of government charged with national defense and public order, *no* department of government is more essential to the daily functioning and long-term survival of that government than its treasury") (emphasis in original)).

This inherent lack of separateness is demonstrated by the Ministry's own motion, which often fails to distinguish between itself and the Republic (and also advances arguments on behalf of another Ministry and arm of the Republic, the Ministry of Finance).  *See, e.g.*, Mot. at 22 (noting that "the Republic"—not the Ministry—"respectfully requests that the Court enter an order quashing the Writ"); Mot. ¶ 15 ("The Republic is challenging the turnover petition . . ."); Turnover Proceeding, ECF No. 17 ¶ 14 (same).  Nor is this a one-off occurrence.  From the filing of its first submission in the Mississippi Litigation, the Ministry did not bother to make any distinction between itself and the Republic.  *See, e.g.*, Ex. 13 (defining the Ministry of Defense as "Venezuela," referring to both the Republic and the Ministry by that term interchangeably, and arguing that Ingalls failed to properly serve Venezuela/the Ministry in accordance with 28 U.S.C. § 1608(a), which applies only to states and their political subdivisions, not to agencies or instrumentalities).

The Contract with Ingalls similarly blends the Ministry and the Republic together into a single entity.  Although Crystallex does not have a complete copy of the Contract, the portions that have been filed publicly and to which Crystallex has access indicate that ***the Republic*** is Ingalls's counterparty and is directly obligated by the Contract to pay for the services that Ingalls agreed to render.  The cover page of a certified translation of an excerpt of the Contract that was filed in the Mississippi Litigation states that the two parties to the agreement are "the National Executive" and "Ingalls Shipbuilding, Inc."  Ex. 10 at ARB-000001.  The Contract further provides that "***the Republic of Venezuela***, through the Ministry of Defense" agreed to enter into the Contract with Ingalls and that "***[t]he Republic of Venezuela***, through the Ministry of Finance, shall pay [Ingalls] the sum of . . . US$315,000,000.00 . . . ."  *Id.* at ARB-000014, ARB-000017 (emphasis added).  In other words, in executing and contemplating its performance under

16

the Contract, the Republic acted through different arms of its unitary National Executive—

namely, its Ministries of Defense and Finance—but the terms make clear that the Republic and

its ministries are one and the same.

In an attempt to create a separate status where one does not exist, the Ministry directs the

Court to *Wye Oak Tech., Inc. v. Republic of Iraq*, 72 F. Supp. 3d 356, 360 (D.D.C. 2014).  But

*Wye Oak* does not stand for the proposition that, under the FSIA, ministries of defense are

separate entities distinct from the larger government whose policies they exist to effectuate.  At

best, *Wye Oak* stands for the proposition that courts look to local law when determining whether

one sovereign entity may be held liable for the actions of another sovereign entity.  *See id.* at

358–59.[13]  The propriety of Crystallex's Writ under the FSIA (and New York state judgment-

execution law) has nothing to do with whether the Republic's liability can be attributed to the

Ministry under Venezuelan law.  Rather, the question that was before this Court in authorizing

the Writ was simply whether the Writ could be issued against the Republic's interest in the

Account.  In any event, the Ministry has not attempted to show that, under Venezuelan law, it

has separate juridical status from the Republic.[14]

There is simply no basis for treating the Republic and the Ministry as separate juridical

entities.

---

[13]  It is worth noting that the District Court in *Wye Oak* departed from the findings of the Fourth Circuit, which previously had held that the Iraqi Ministry of Defense was not a separate juridical entity from the Republic of Iraq under the FSIA because its core functions— "waging war and defending the state"—were "inherently governmental."  *Wye Oak Tech.*, 666 F.3d at 215.

[14]  Nor could it.  Under Venezuelan law, and consistent with the terms of the Contract entered into with Ingalls, the various ministries are arms of the National Executive and have no meaningful separate status.  *See* Declaration of José Ignacio Hernández, dated November 3, 2017.

**E.    The Preliminary Injunction Issued By The Mississippi Court Has No Bearing On Crystallex's Entitlement To Execute On The Assets In The Account**

Because the Account is located in New York in the hands of The Bank of New York, Crystallex needed to pursue the Writ in this Court.[15]  Despite the Ministry's suggestion to the contrary*, see* Mot. at 17, and although the Mississippi Litigation undoubtedly relates to Ingalls's and the Republic's interests in the Account, the Mississippi Court does not have *in rem* jurisdiction over the assets in the Account.  By contrast, this Court has jurisdiction over the *res* in the Account because the Account assets were present in New York in The Bank of New York's possession prior to the issuance of the Writ.  Moreover, by virtue of the service of the Writ on the United States Marshals, the Marshals now have constructive possession of the asset in New York, and only this Court has the power to dispossess them of the asset.  *See Hewlett Park Co. v. 1193-1205 E. Broadway of Hewlett*, 32 Misc. 2d 691, 692 (Sup. Ct. N.Y. Cty. 1961), *aff'd*, *Hewlett Park Co. v. 1193-1205 E. Broadway of Hewlett*, 17 A.D.2d 736 (1st Dep't 1962) ("The personal property of a judgment debtor becomes subject to a lien of the judgment on the date of the issue of execution to a sheriff and upon receiving such execution the sheriff obtains constructive custody of the property.  Actual seizure is unnecessary."); *c.f. Corsair Special Situations Fund, L.P. v. Engineered Framing Sys. Inc.*, 2016 WL 128089, at *4 (D. Conn. Jan. 11, 2016) (finding that Connecticut State Marshal had "constructively seized the debt" at issue

---

[15]  There is simply no basis for the Ministry's contention that it was improper for Crystallex to have filed its Section 1610(c) application *ex parte* and under seal, *see* Mot. at 17–19.  As Crystallex explained in its application for the Writ, it needed to move *ex parte* because (i) it was "extremely likely that Venezuela would take immediate steps to encumber or assign its interest" in the Account; (ii) under the CPLR, in the ordinary course, a writ of execution is issued without Court involvement (and without notice to the debtor); and (iii) under the FSIA, a judgment creditor is not required to provide notice to the judgment debtor—except in cases of default judgment—before obtaining a court-ordered attachment in aid of execution.  *See* ECF No. 13 at 9–10

where he had served a writ "demand[ing] . . . that [third party] deliver to him property in its

possession that it owed the judgment debtor").  Crystallex's application for the Writ, thus, was

rightfully—and necessarily—before this Court.

Ignoring this Court's jurisdiction over the *res*, the Ministry argues that the existence of

the Mississippi Litigation—and, more specifically, the preliminary injunction that was entered

by the Mississippi Court—somehow makes Crystallex's writ "impermissible."  *See* Mot. at 16.

In support of this argument, the Ministry asks this Court to find that the preliminary injunction

order, which did not decide who owns the Account, is subject to the Full Faith and Credit Clause

of the United States Constitution and 28 U.S.C. § 1738.  *See id.*  Putting aside the fact that it is

unclear what portion of the order the Ministry thinks would somehow preclude the issuance of

the Writ, the Ministry does not—and cannot—cite any authority supporting the proposition that

preliminary injunction orders are entitled to full faith and credit.  Indeed, "both the Full Faith and

Credit Clause and Section 1738 require that full faith and credit be given only to a *final*

judgment," not to a preliminary injunction order or any other type of interlocutory order.  *Stinson

v. Hance*, 2002 WL 31834464, at *1 (S.D.N.Y. Dec. 17, 2002) (citing *Kulko v. Superior Court of

California*, 436 U.S. 84, 95 (1978)) (emphasis in original); *see also MacArthur v. San Juan Cty.*,

497 F.3d 1057, 1065–66 (10th Cir. 2007) (noting that "only final judgments are subject to

enforcement pursuant to full faith and credit principles" and that preliminary injunctions entered

to preserve the status quo "hardly constitute final judgments") (citing *Durfee v. Duke*, 375 U.S.

106, 111 (1963)); *Am. Fidelity Fire Ins. Co. v. Paste-Ups Unlimited, Inc.*, 368 F. Supp. 219, 226

(S.D.N.Y. 1973) ("[I]t is clear that a mere interlocutory order, issued by a Court in aid of its

jurisdiction, will not be afforded full faith and credit in New York.").[16]  The preliminary

injunction issued by the Mississippi Court thus did not impede this Court's ability to authorize

the issuance of the Writ.

To the extent that the Ministry is arguing that the existence of the preliminary injunction

order creates some enforceable interest in the Account that could impact the propriety and

viability of Crystallex's Writ, the Ministry is in error.  The preliminary injunction did not create

a lien (or any other security interest) to the benefit of Ingalls—or anyone else for that matter.

*See United States v. Lin Hu*, 2011 WL 5884918, at *4–5 (E.D.N.Y. Nov. 23, 2011), *aff'd sub*

*nom. United States v. Church & Dwight Co.*, 510 F. App'x 55 (2d Cir. 2013) (summary order)

(rejecting creditor's argument that either a preliminary injunction, default judgment, or

settlement agreement created a particularized lien on assets at issue; while creditor's "money

judgment may have given [the creditor] the right to obtain a lien on specific assets," the creditor

"did not do so"); *see also Berger v. Raab*, 555 N.Y.S.2d 935, 936–37 (N.Y. App. Div. 1990)

(because preliminary injunction "by its nature, is interlocutory, a provisional remedy which is

designed to maintain the status quo," it was not a lien that "in any way restricted or encumbered"

assets at issue).

---

[16]  The cases on which the Ministry relies do not hold otherwise.  *See Embry v. Palmer*, 107
U.S. 3, 10 (1883) (considering recognition of final judgment); *Emp'rs Reins. Corp. v. Mid-
Continent Cas. Co.*, 358 F.3d 757, 765–66 (10th Cir. 2004) (declining to apply Full Faith and
Credit Clause where original judgment did not include interpretation of clause at issue in
subsequent litigation).

**F.      The Republic Used The Assets In The Account For A Commercial Purpose Within The Meaning Of The FSIA**

The Account was created and used for a commercial purpose: the refurbishment and repair of ships by a commercial contractor.  The Ministry's attempts to avoid this simple fact are unavailing.

**1.      The Assets In The Account Are Of A Commercial Nature**

As Crystallex explained in its Section 1610(c) application, the Republic is using the assets for a commercial activity within the meaning of FSIA Section 1610.  ECF No. 13 at 11–13.  "[W]hat determines whether these assets are being used for a commercial purpose is 'whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" ECF No. 13 at 12 (citing *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 607 (1992) (emphasis in original)).[17]  That the commercial contract into which the Republic entered involves military property—naval vessels—is of no import because it is not the military property that Crystallex seeks to seize.  Thus, the Ministry's authority, which involves attempts to attach military aircraft, is simply inapt.  *See Colella v. Republic of Argentina*, 2007 WL 1545204, at \*8 (N.D. Cal. May 29, 2007); *All Am. Trading Corp. v. Cuartel Gen. Fuerza Aerea Guardia Nacional De Nicaragua*, 818 F. Supp. 1552, 1553 (S.D. Fla. 1993).

---

[17] Section 1603(d) defines "commercial activity" for purposes of the FSIA.  *See* 28 U.S.C. § 1603(d).  "The definition section of the statute, in defining 'commercial activity,' does not provide any different definition for § 1605 [the jurisdictional immunity provision] versus § 1610 [the attachment immunity provision]."  *Aurelius Cap. Partners, LP v. Republic of Argentina*, 2009 WL 755231, at \*13 (S.D.N.Y. Mar. 12, 2009), *rev'd and vacated on other grounds*, 584 F.3d 120 (2d Cir. 2009).  Therefore, courts look to decisions concerning immunity under both § 1605 and § 1610 to construe the meaning of that term.  *E.g.*, *De Letelier v. Republic of Chile*, 748 F.2d 790, 797–98 (2d Cir. 1984) (relying on § 1605 decision to resolve § 1610 commercial activity issue).

Indeed, the Ministry's argument that the FSIA's "military character" attachment exception applies to money that is used for a commercial activity simply because that commercial activity ultimately has a military- or other government-related purpose has been rejected time and time again. *See Weltover*, 504 U.S. at 614–15 ("[A] contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods."); *NML Cap., Ltd. v. Republic of Argentina*, 680 F.3d 254, 260 (2d Cir. 2012) (finding that "governmental motives do not change the fact that the [New York bank account] is used to *purchase* scientific equipment," and "purchase of scientific equipment" was commercial activity (emphasis in original)); *United Euram Corp. v. Union of Soviet Socialist Republics*, 461 F. Supp. 609, 611 (S.D.N.Y. 1978) ("[A] contract by a foreign government to buy provisions or equipment for its armed forces or to construct a government building constitutes a commercial activity.").

### 2.     The Republic Used The Assets In The Account

The Republic used the funds in the Account for a commercial purpose.  As set forth at length above, *see supra* at 10–13, the Account Agreement makes clear that the Republic not only retains an ownership interest in the Account assets but also maintains the ability to use the assets. The Republic is the sole beneficiary of the Account Agreement, *see* Ministry Ex. B § 2.1, and, through its Chief of the Venezuelan Inspection Committee, it retains the sole discretion to determine whether and when The Bank of New York makes payments to Ingalls.[18]  *See id.* § 3.1(b).  Through its Ministry of Finance, the Republic also retains a reversionary interest in the Account funds that is triggered when the Republic determines that it no longer owes payments to

---

[18]  The Republic also has used the funds in the Account to pay its obligations to bondholders. *See* Ex. 12 ¶¶ 3–4, 11.

Ingalls.  *See id.* § 3.1(e).  And, of course, the Republic can agree with The Bank of New York to modify—and, thus, terminate—the Agreement at any time, without the consent of any third party, including the Ministry.  *See id.* § 8.2.

Ignoring the true nature of the Account Agreement, the Ministry turns to the decision in *Ladjevardian* to argue that funds held in trust can never be targeted by a writ of execution as such funds "*cannot* be . . . 'used' by the [sovereign] at all" within the meaning of the FSIA. 2016 WL 2016 WL 3039189, at *5 (emphasis in original).  But, here, the entire purpose of the Account is to hold funds for the Republic's benefit and use in paying Ingalls for its services if and when the Republic determines that payments are due.  *See* Ministry Ex. B §§ 2.1, 3.1.  The existence of the Account Agreement thus did not preclude the Republic's commercial use of the targeted funds; to the contrary, it was designed for the express purpose of facilitating that use.

As a last-ditch effort to avoid the obvious commercial use of the funds in the Account, the Ministry argues that the existence of the preliminary injunction in the Mississippi Litigation prevents the Republic from using the funds in the Account at all.  Even assuming, *arguendo*, that the existence of a preliminary injunction theoretically could render a bank account exempt from execution under the FSIA, the plain terms of the preliminary injunction here make clear that the Account assets retain their commercial character and continue to be available for the Republic's use.  The Mississippi Court expressly permitted the Republic's continued use of the funds in the Account in order to make payments to Ingalls.  *See* Ministry Ex. A at 6 (ordering that The Bank of New York "is hereby restrained from transferring, or allowing to be transferred, any funds from the Republic of Venezuela's Trust Account . . . for any purpose ***other than to pay Ingalls in accordance with the [Account Agreement], which payments may be made without further order from this Court***") (emphasis added)).  Because the preliminary injunction does not prevent

payments to Ingalls at the Republic's direction, the funds in the Account remain available for the Republic to use for a quintessentially commercial activity: the payment of a contractor's invoices.[19]

## CONCLUSION

For the reasons set forth above, this Court should deny the Ministry's motion to quash or, in the alternative, hold any decision on the motion to quash in abeyance pending Judge Broderick's decision in the pending Turnover Proceeding.

Dated:     November 3, 2017
           New York, New York

                                          **GIBSON, DUNN & CRUTCHER LLP**

                                          By:     /s/ Robert L. Weigel
                                                  Robert L. Weigel
                                                  Jason W. Myatt
                                                  GIBSON, DUNN & CRUTCHER LLP
                                                  200 Park Avenue
                                                  New York, New York 10166
                                                  Tel: (212) 351-4000
                                                  Fax: (212) 351-4035

                                                  *Attorneys for Plaintiff Crystallex*
                                                  *International Corporation*

---

[19] The Ministry's argument that the preliminary injunction precludes a finding that a sovereign has use of the property is based on cases (i) where the funds lost their commercial status at the moment that they became subject to government ownership or control (which was also the moment the attachment order became effective), *Aurelius Capital Partners, LP*, 584 F.3d at 131, or (ii) the government had been stripped of any right to use the funds for any purpose while an injunction was pending, *EM Ltd. v. Republic of Argentina*, 2010 WL 2399560, at *1 (S.D.N.Y. June 11, 2010).  Neither situation applies here as the property was commercial property while in the hands of the sovereign, and the preliminary injunction has not served to prevent the Republic from using the funds for all purposes.